## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Mark Andrew Tracy,

                Plaintiff,

                              Civ. No. 10-4549 (RHK/JSM)
                              **MEMORANDUM OPINION**
                              **AND ORDER**

v.

Joseph Neuberger, John Doe No. 1,
Michael Sullivan, and Dale Burns,

                Defendants.

---

David L. Shulman, Craig A. Buske, Law Office of David L. Shulman PLLC, Minneapolis, Minnesota, for Plaintiff.

Susan M. Tindal, Iverson Reuvers, LLC, Bloomington, Minnesota, for Defendants.

---

### INTRODUCTION

This action arises out of Plaintiff Mark Tracy's arrest during the 2008 Republican National Convention ("RNC") in St. Paul, Minnesota. Tracy alleges that the Defendant police officers arrested him without probable cause, violating both his First- and Fourth-Amendment rights pursuant to 42 U.S.C. § 1983. Defendants have moved for summary judgment, asserting that they are entitled to qualified immunity on Tracy's claims. For the reasons below, the Court will grant the Motion.

### BACKGROUND

The pertinent facts are largely undisputed. As required at this juncture, however, the events giving rise to this action are recited below in the light most favorable to Tracy.

E.g., Rau v. Roberts, 640 F.3d 324, 327 (8th Cir. 2011).

September 1, 2008, was the first day of the RNC in downtown St. Paul.  Many

officers with the St. Paul Police Department ("SPPD") and other departments around the

area were on duty, having received special training for situations they might encounter

during the convention.  Defendant Joseph Neuberger, a Senior Commander with the

SPPD, headed up the law-enforcement efforts during the convention from a command

center.  (See Neuberger Dep. 7-8.)  The officers were organized into mobile field forces

("MFFs").  (E.g., Sullivan Dep. 10.)   Two MFF divisions were involved in the actions

giving rise to Tracy's claims.  They were led by Defendant Sergeant Dale Burns and

Defendant Lieutenant Michael Sullivan, respectively, both officers with the Minneapolis

Police Department ("MPD").  (See Burns Dep. 8; Sullivan Dep. 5, 8.)

On the morning of September 1, Tracy drove to downtown St. Paul with his

friend, Michael Birchard.  He parked his car in the Sears parking lot at the edge of

downtown, and from there he and Birchard continued on their bicycles.  (Tracy Dep. 10.)

Their purpose in going downtown was to pass out a political magazine they had

produced, entitled "my peace city," and they brought several thousand copies of this

magazine with them.  (Id. 13-14.)

They first rode to the Capitol where they joined friends, family, and others to

observe and participate in a rally against the RNC and distribute copies of their magazine.

(Id. 13-16.)  Later, they took part in a march that began on the Capitol grounds and ended

near the Xcel Energy Center, where RNC events were taking place.  (Id. 19-20.)  This

march had been permitted and approved by the city.  After it ended, Tracy and Birchard

rode to the Lowertown area of downtown to bring magazines to a café. The two of them were traveling alone at this point and were not part of any larger group. (Id. 25-27.) After delivering magazines to the café, they began to ride north through downtown towards Tracy's car, continuing to distribute magazines along the way. (Id. 32.) At no point during the march or while riding his bicycle afterwards did Tracy observe anyone engaged in criminal acts such as turning over dumpsters, breaking windows, or creating roadblocks. (Id. 27-28, 33-34.)

On their return to the car, Tracy and Birchard rode along the sidewalk on Temperance Street, heading north towards Ninth Street. (Tracy Aff. ¶ 3.) To their left (that is, to the west of Temperance Street) was a block largely comprised of an open parking lot. (E.g., id. Ex. 1.) The parking lot was the scene of the incident giving rise to this action. It is bordered by Temperance Street on the east, Jackson Street on the west, Ninth Street on the north, and Seventh Street on the south. Along the Temperance-Street side of the block are two buildings, one at the north corner and one at the south corner, with an opening between the buildings through which one can enter the parking lot.



When they passed the opening between the two buildings on this block of

Temperance Street, Birchard was riding ahead of Tracy.  (Id. ¶ 4.)  As Tracy passed the

opening and looked into the parking lot to his left, he observed a group of what he

estimated to be 25-50 people,[1] whom he did not recognize, running across the lot toward

him.  (Tracy Dep. 38.)  Unbeknownst to Tracy at the time, police had been pursuing this

group around the downtown area for over an hour and had observed numerous

individuals within the group committing criminal acts, including breaking windows,

throwing newspaper vending machines and other items into the roads, and vandalizing a

police car.  Burns had recommended, and obtained Neuberger's approval for, a plan to

encircle the group and arrest them.  (Burns Dep. 18, 40, 55-56.)  He ordered his MFF to

set up police lines and carry out this plan, and Sullivan repeated the same orders to his

MFF.  (Sullivan Dep. 32-33, 42.)

At the precise time Tracy was riding past the parking lot, officers were quickly

approaching the parking lot from different directions.  Tracy had just ridden past the

opening between the two buildings on the Temperance-Street side of the parking lot and

was continuing to ride his bike north on the sidewalk when an officer on a motorcycle

arrived and told him to stop and get off his bike.  (Tracy Dep. 39-40.)  The officer did not

stop Birchard, who was ahead of Tracy and had already passed the opening when the

officer arrived.  (Tracy Aff. ¶ 4.)  The identity of this officer is unknown; neither Tracy

nor the Defendants know his name, or even whether he was with one of the MFF

---

[1] Some of the officers estimated that the group was as large as 75 or 100 people.  (See Shulman Aff. Ex. H.)

divisions commanded by Burns or Sullivan. (E.g., Tracy Aff. ¶ 4.) He is not the same officer who later booked Tracy and formally processed his arrest, and he has not been named as a Defendant in this action.

Tracy complied with the officer's request to stop and get off his bike but told him, "I'm just biking with my friend. I'm not with that group." (Tracy Dep. 37.) The officer left and went into the parking lot where the group was being contained, but he instructed Tracy to wait where he was. (Id. 37, 42.) Tracy did not feel as though he was free to leave, and he obeyed the officer. (Tracy Aff. ¶ 5.) The officer later returned and told Tracy to sit against the wall of one of the buildings bordering the parking lot. (Tracy Dep. 42.) Tracy did so and, while sitting against the wall, was handcuffed by another unidentified officer (but not the officer who had initially stopped him). (Id. 42, 44.)

After Tracy had been sitting in the parking lot for 15 to 30 minutes and was already in handcuffs, Defendant Officer John Doe 1 ("Doe")[2] took control of him. (Doe Dep. 12.) He oversaw Tracy's processing and booking, completed the "Authority to Detain" form, and saw that Tracy was put into a van to be transported to jail. (Id. 12, 37; Shulman Aff. Ex. F.) Doe did not question Tracy about his involvement in the suspected criminal activities before processing and booking him. (Tracy Aff. ¶ 6; Doe Dep. 23.) The paperwork he completed indicated that Tracy's arrest was for felony riot and, as a result of that charge, he was not eligible for immediate release because he was deemed to

---

[2] "Doe" does not represent an unknown person but is a known individual who has been deposed and otherwise participated in this litigation. He is designated as John Doe in of this action, however, because he works as an undercover police officer.

be a risk to engage in further criminal activity or unlikely to respond to a citation.

(Shulman Aff. Ex. F.)

Tracy was held in jail for 48 hours, during which time he experienced anxiety

resulting from his inability to communicate with his family or prepare for the classes he

taught in his job as a community-college professor.  (Tracy Dep. 46, 48-51.)  He was

released two days later and ultimately was not charged with any crime.  This action

followed.  Defendants have now moved for summary judgment, asserting that they are

entitled to qualified immunity.  The Motion was fully briefed, a hearing was held on

December 21, and it is now ripe for decision.

## STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences in favor of the

nonmoving party, there is no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett,

477 U.S. 317, 322-23 (1986).  The moving party bears the burden of showing that the

material facts in the case are undisputed.  Id. at 322; Whisenhunt v. Sw. Bell Tel., 573

F.3d 565, 568 (8th Cir. 2009).  The Court must view the evidence, and the inferences that

may be reasonably drawn from it, in the light most favorable to the nonmoving party.

Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009); Carraher v.

Target Corp., 503 F.3d 714, 716 (8th Cir. 2007).  The nonmoving party may not rest on

mere allegations or denials, but must show through the presentation of admissible

evidence that specific facts exist creating a genuine issue for trial.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 256 (1986); Wingate v. Gage Cnty. Sch. Dist., No. 34, 528

F.3d 1074, 1078-79 (8th Cir. 2008).

## ANALYSIS

Defendants argue that they are entitled to qualified immunity on Tracy's claims.

In evaluating this assertion, the Court conducts a two-step analysis. It must assess

whether the facts alleged, when viewed in the light most favorable to Tracy, show that

the challenged conduct violated a constitutional right. Then, if a violation can be

established based upon those facts, the Court must determine whether the constitutional

right at issue was clearly established on the date in question. E.g., Avalos v. City of

Glenwood, 382 F.3d 792, 798 (8th Cir. 2004) (citing Saucier v. Katz, 533 U.S. 194, 201

(2001)). The Court has the discretion to choose which of these two questions to answer

first. Pearson v. Callahan, 555 U.S. 223, 235-36 (2009).

## I.    Fourth-Amendment claim

The Fourth Amendment guarantees individuals the right to be free from arrest

without probable cause. E.g., Walker v. City of Pine Bluff, 414 F.3d 989, 992 (8th Cir.

2005). Even where probable cause is absent, however, an officer is entitled to qualified

immunity if probable cause *arguably* existed at the time of the arrest. Id. (quoting

Habiger v. City of Fargo, 80 F.3d 289, 295 (8th Cir. 1996)). In determining whether

qualified immunity exists, each Defendant's conduct must be independently assessed.

E.g., Heartland Acad. Cmty. Church v. Waddle, 595 F.3d 798, 805-06 (8th Cir. 2010)

(citation omitted). Hence, although Defendants have lumped themselves together in

arguing for qualified immunity, the Court must evaluate the extent to which each officer

participated in Tracy's arrest and determine whether that officer is entitled to qualified

immunity. Only an officer with some "direct participation" in an arrest may be held

liable if the arrest is later determined unlawful. See, e.g., Otey v. Marshall, 121 F.3d

1150, 1155 (8th Cir. 1997).

### A.    When the arrest occurred

Before the Court can assess the individual Defendants' conduct, it must determine

*when* Tracy's arrest occurred. Tracy maintained at oral argument that Doe arrested him,

while the motorcycle officer and other unidentified officers he encountered earlier were

simply conducting a "stop." Both investigative stops and arrests are "seizures" under the

Fourth Amendment, but stops require only a "reasonable, articulable suspicion that

criminal activity may be afoot" while "arrests must be supported by probable cause."

United States v. Raino, 980 F.2d 1148, 1149 (8th Cir. 1992). There is no bright line

distinguishing between the two. United States v. Miller, 974 F.2d 953, 957 (8th Cir.

1992). An officer "may check for weapons and may take additional steps reasonably

necessary to protect [his] personal safety and maintain the status quo during [an

investigative] stop." Id. (internal quotation marks and citation omitted). However, a stop

ripens into an arrest "if the officer['s] conduct is more intrusive than necessary." United

States v. Rose, 731 F.2d 1337, 1342 (8th Cir. 1984). There is no dispute that Tracy was

arrested, and his claims are based solely upon his arrest, not upon any investigatory stop

preceding it. (Compl. ¶¶ 16-17 ("[D]efendants violated [P]laintiff's right[s] . . . when

they caused him to be arrested and jailed.").) But the Court cannot agree with his

characterization of when the arrest actually occurred.

To determine when a stop is converted into an arrest, the Court considers the following factors:

> (1) the number of officers and police cars involved, (2) the nature of the crime and whether there is reason to believe the suspect is armed, (3) the strength of the officer's articulable, objective suspicions, (4) the need for immediate action by the officer, (5) the presence or lack of suspicious behavior or movement by the person under observation, and (6) whether there was an opportunity for the officer to have made the stop in less threatening circumstances.

Fakorzi v. Dillard's, Inc., 252 F. Supp. 2d 819, 827-28 (S.D. Iowa 2003) (quoting United States v. Thompson, 906 F.2d 1292, 1296 (8th Cir. 1990)). Here, while the motorcycle officer's initial order for Tracy to stop and wait may well have been a permissible investigative stop, the officer's involvement did not end there. Instead, he returned to Tracy's location and ordered him to sit against the wall bordering the parking where the group was being detained, despite Tracy's statement that he was not with the group in the parking lot. There is no evidence that the officer conducted any investigation or inquiry into Tracy's involvement in criminal activity. Furthermore, Tracy had already been placed in handcuffs (by yet another unidentified officer) before Doe encountered him. While handcuffs do not automatically convert a stop into an arrest, they are a "hallmark of a formal arrest." United States v. May, 440 F. Supp. 2d 1016, 1029 (D. Minn. 2006) (Kyle, J.) (citing New York v. Quarles, 467 U.S. 649, 655 (1984)); accord United States v. Acosta-Colon, 157 F.3d 9, 18 (1st Cir. 1998) ("There is no question that the use of handcuffs [is] one of the most recognizable indicia of a traditional arrest."). This is particularly true where, as here, there is no evidence in the record suggesting that Tracy was armed or dangerous so as to make handcuffing reasonably necessary to protect

9

officers and maintain the status quo during the investigatory stop.  E.g., El-Ghazzawy v.

Berthiaume, 636 F.3d 452, 457-58 (8th Cir. 2011) (finding use of handcuffs unreasonable

as part of investigatory detention where there was no indication the suspect was armed or

dangerous); United States v. Summe, 182 Fed. App'x 612, 614 (8th Cir. 2006)

(concluding brief use of handcuffs did not convert stop to arrest where police had a

legitimate concern that weapons were present).  Additionally, numerous officers were

present and Tracy was fully cooperative; these factors further suggest that handcuffs were

unnecessary for purposes of a stop and thus converted it into an arrest at some point prior

to Tracy's interaction with Doe.

**B.    Officer Doe**

The Court turns to Doe's conduct.  Tracy argues at length that Doe lacked

probable cause to arrest him because he was *not* actually part of the group of rioters.

Indeed, at the time the motorcycle officer stopped Tracy, he was away from the rest of

the group and just happened to be riding his bicycle near the area where they were

converging, and there was little if any other indication that he was with the group—in

other words, he happened to be in the wrong place at the wrong time.  Were the Court

analyzing whether the *motorcycle officer* had probable cause to arrest Tracy for felony

riot, the answer based upon the current record likely would be "no."  Yet no one has been

able to identify that officer and bring him into the case.

Rather than focusing on the non-Defendant motorcycle officer's probable cause,

the Court must instead analyze *Doe*'s conduct.  Were Doe the "arresting officer," as both

parties incorrectly contend, the question would be whether, based on the circumstances

and information known to him at the time, he had arguable probable cause to arrest

Tracy. Although both Tracy and Defendants label Doe the "arresting officer," the Court

concludes for the reasons set forth above that Tracy had *already* been arrested before Doe

came into contact with him. As the Eighth Circuit held in Garionis v. Newton, "a person

who is already under arrest and in police custody cannot be 'rearrested.'" 827 F.2d 306,

310 (8th Cir. 1987). In that case, Garionis was arrested by a reserve deputy sheriff for

wearing a political button at a polling place, in violation of Arkansas law; the deputy

removed Garionis from the polling place, and then a second officer took custody of him

and booked him into jail. See id. at 308. When Garionis asserted an unlawful-arrest

claim against the second officer, the court concluded that because Garionis had not been

released from custody, "there was no subsequent arrest, and no need for probable cause"

as to that officer. Id. at 310. The same is true of Doe. Tracy was not "at liberty, free

from police custody," before Doe took custody of him. Id. He was already under

arrest—in handcuffs, sitting against the wall, with numerous police officers surrounding

the area—and could not be "rearrested" by Doe. Thus, there was no need for Doe to have

probable cause, and he cannot be liable here.

Tracy further argues that Doe should have at the very least asked him some

questions in attempt to *confirm* that there was probable cause for the arrest before

processing and booking him. See, e.g., Amrine v. Brooks, 522 F.3d 823, 832 (8th Cir.

2008) (quoting Kuehl v. Burtis, 173 F.3d 646, 650 (8th Cir. 1999)) ("[P]robable cause

does not exist when a 'minimal further investigation' would have exonerated the

suspect."). For instance, in another RNC case in which the plaintiff was arrested on

CASE 0:10-cv-04549-RHK-JSM   Document 40   Filed 01/06/12   Page 12 of 16

suspicion that she was carrying bricks, her arrest was deemed unlawful because a minimal investigation would have exonerated her.  Binion v. City of St. Paul, 788 F. Supp. 2d 935, 944 (D. Minn. 2011) (Schiltz, J.) ("After all, Binion was accused of carrying *bricks*. . . . It would have taken the police mere seconds to discover that Binion was not carrying a brick.").  Here, on the other hand, a quick pat-down would not necessarily have exonerated Tracy.  The most Doe could have done was question Tracy, but requiring an officer to ask a suspect whether he was involved in criminal activity (and then presumably take him at his word if he denies such involvement) serves no practical purpose.  Where, as here, an officer comes upon someone who has already been arrested, the Court cannot conclude that the officer violates the Fourth Amendment by failing to question the suspect and independently confirm that the officer who arrested him had probable cause.  In short, qualified immunity protects Doe from liability.

C.      **Officers Neuberger, Burns, and Sullivan**

The Court next turns to Neuberger, Burns, and Sullivan.  None of these three Defendants came into contact with Tracy on September 1; the extent of their participation in his arrest was recommending, approving, and supervising the execution of the order to encircle the group of rioters in the parking lot and arrest them there.[3]  To establish a claim for § 1983 liability on the part of supervisors like these Defendants, a plaintiff must proffer evidence allowing a jury to "identify (1) action on the part of [the supervisor]

---

[3] Because these three Defendants' participation in the arrest was essentially the same—i.e., giving and relaying orders without any contact with Tracy—the Court is able to group them together for purposes of the qualified-immunity analysis.

causing (2) one or more constitutional violations." Tilson v. Forrest City Police Dep't,

28 F.3d 802, 806 (8th Cir. 1994). Here, even if ordering the group arrest was a sufficient

action on the part of these Defendants to constitute "direct participation" in Tracy's

arrest, Neuberger, Burns, and Sullivan cannot be liable because the record is devoid of

any evidence of a causal connection between their orders and the arrest. E.g., Tilson, 28

F.3d at 806 (requiring showing of "action on the part of [the supervising officer] *causing*

[] one or more constitutional violations"). This causal link is missing because the

identities of the motorcycle officer and the officer who handcuffed Tracy are unknown,

and the record is devoid of any evidence of their motivations. There is no indication, for

instance, that the motorcycle officer was acting pursuant to the arrest order at issue when

he stopped Tracy, or even that he had received the order.[4] He may have stopped Tracy

for riding on the sidewalk, or for some other reason, or for no reason at all. The same is

true of the officer who placed Tracy in handcuffs. While Tracy's rights may have been

violated by his arrest, liability cannot be foisted on these Defendants in the absence of

evidence connecting the mass-arrest orders to Tracy's arrest. In short, the causation

needed to hold Neuberger, Burns, or Sullivan liable for a constitutional violation arising

out of Tracy's arrest is lacking.[5]

---

[4] At oral argument, Defendants represented that the motorcycle officer was acting pursuant to Neuberger's arrest order, which he most likely heard because it went out over the radio and all motorcycle officers had radios. Yet the evidence supporting these assertions appears nowhere in the record, and statements of counsel are not evidence. See, e.g., Wittenburg v. Am. Exp. Fin. Advisors, Inc., 464 F.3d 831, 838 (8th Cir. 2006).

[5] The parties argue at length about whether a mass arrest without particularized probable cause as to each individual arrested is constitutional, as held by the D.C. Circuit in Carr v. District of Columbia, 587 F.3d 401 (D.C. Cir. 2009). Regardless of Carr's (questionable) wisdom, the

Furthermore, the commanding officers cannot be vicariously liable for the conduct of their subordinates.  First, as discussed above, Tracy cannot establish that the officer(s) who arrested him were acting under the command or supervision of any of the Defendants, because nothing is known about those officers' identities.  Furthermore, even if it could be reasonably inferred that the motorcycle officer was the subordinate of one or more of these Defendants, "[s]ection 1983 liability cannot attach to a supervisor merely because a subordinate violated someone's constitutional rights."  Otey v. Marshall, 121 F.3d 1150, 1155 (8th Cir. 1997) (citing City of Canton v. Harris, 489 U.S. 378, 385 (1989) ("*Respondeat Superior* or vicarious liability will not attach under §1983."")).  Absent some evidence of direct participation in the arrest, or of failure to adequately train, supervise, or discipline, a supervisor simply cannot be held liable for an arrest under § 1983.  E.g., Tilson, 28 F.3d at 806 (citations omitted) (finding supervisor could be liable only "if he directly participated in the constitutional violation, or if his failure to train or supervise the offending actor caused the deprivation.").  Here, the only direct participation by Neuberger, Burns, and Sullivan was the order (which, for the reasons above, cannot give rise to liability), and Tracy has asserted no claim based upon failure to adequately train, supervise, or discipline.  Accordingly, Neuberger, Burns, and Sullivan are also entitled to qualified immunity.

---

Court need not opine here whether a mass-arrest order is lawful since it concludes there is no evidence linking the order to Tracy's actual arrest.

**II.      First-Amendment claim**

Finally, the Court turns briefly to Tracy's claim that Defendants also violated his

First-Amendment rights by arresting him "on account of their decision to clear the

streets of protestors, their perception of [him] as a protestor, and [his] distributing

political literature." (Am. Compl. ¶ 19.)  Defendants acknowledge, to the extent the

claim is based on Tracy's arrest, that it is subject to the Fourth-Amendment analysis.

(E.g., Mem. in Supp. 14 ("[B]ecause the First Amendment claims stem from Tracy's

arrest, it is more appropriately analyzed under the Fourth Amendment.").)  Tracy does

not dispute this, instead asserting "[t]here is no need to address [the] claim here because

it is subject to the same analysis as his arrest without probable cause claim under the

Fourth Amendment." (Mem. in Opp'n 19 n.1.)  To the extent Tracy's First-Amendment

claim is based solely on his unlawful arrest, the Court agrees that the same analysis set

forth above applies, and Defendants are entitled to qualified immunity.

Defendants also contend that to the extent Tracy's First-Amendment claim alleges

anything beyond false arrest, he lacks any evidence that he was targeted because he was

exercising his First-Amendment rights.  (Mem. in Supp. 15.)  Tracy fails to acknowledge

or address this argument in his responsive brief, tacitly conceding he has no such

evidence.  Furthermore, the Court's review of the record at this juncture, even taken in

the light most favorable to Tracy, reveals no evidence that his arrest was in any way

linked to his expression of political views or exercise of other First-Amendment rights.

The officers maintain they took action against the group based upon their observations

of property damage and rioting, and nothing in the record suggests that this reason was

pretextual or that the arrests were actually based upon officers' disagreement with the views being espoused by Tracy or members of the group. Thus, to the extent the First-Amendment claim alleges anything independent from the Fourth-Amendment claim, it also cannot survive.

## CONCLUSION

In some cases, the Court confronts sympathetic plaintiffs who are without remedy by operation of law due to a doctrine such as qualified immunity. This is such a case. Although Tracy appears to have done nothing to justify his arrest on September 1, 2008, the Court cannot impose liability on any of the Defendants he has named in this action based upon their conduct.

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 20) is **GRANTED**, and Tracy's Amended Complaint (Doc. No. 14) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated: January 6 , 2012                    __s/ Richard H. Kyle_____ _
                                           RICHARD H. KYLE
                                           United States District Judge